UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| NEXT LEVEL TECHNOLOGY GROUP, LLC, a South Dakota Limited Liability Company, <br><br> Plaintiff, <br><br> vs. <br><br> WEHDE ENTERPRISES, LLC, a South Dakota Limited Liability Company, and BRANDON WEHDE, individually, <br><br> Defendants. | 4:24-CV-04199-KES <br><br><br> ORDER DENYING PLAINTIFF'S MOTION FOR *EX PARTE* PRELIMINARY INJUNCTION AND DENYING DEFENDANTS' MOTION TO STRIKE |

Plaintiff, Next Level Technology Group, LLC (NLT), moved under Federal Rule of Civil Procedure 65 for an *ex parte* preliminary injunction against defendants, Wehde Enterprises (WE) and Brandon Wehde (Wehde). Docket 3. Defendants oppose the motion. Docket 10. Plaintiff filed a reply, Docket 14, and an *ex parte* affidavit in support of its motion for a preliminary injunction, Docket 15. Defendants moved to strike portions of plaintiff's reply brief and the entirety of the *ex parte* affidavit. Docket 16; Docket 17 at 1. Plaintiff opposes the motion to strike. Docket 18.

The court held an evidentiary hearing regarding the preliminary injunction on December 3, 2024. Docket 26. For the following reasons, the court denies plaintiff's motion for an *ex parte* preliminary injunction and denies defendants' motion to strike.

## PROCEDURAL HISTORY

On October 31, 2024, NLT filed suit against defendants seeking compensatory damages, punitive damages, and injunctive relief. Docket 1 at 14. NLT's claims against both defendants included claims for unjust enrichment, conversion, tortious interference with business relationships and/or expectancies, a violation of the Stored Communications Act under 18 U.S.C. § 2701, misappropriation of Trade Secrets in violation of 18 U.S.C. § 1836, and conspiracy. *Id.* at 9-13. NLT also alleged a claim for breach of oral contract solely against defendant WE. *Id.* at 8-9.

On November 1, 2024, NLT moved for an *ex parte* preliminary injunction against defendants, specifically seeking the following relief:

1. Prohibiting Defendants from using any of Plaintiff's access codes or information about its customers, vendors, products, policies, procedures or any other thing that Plaintiff provided to Defendant Wehde during the course of Defendant Wehde's association with Plaintiff;

2. Ordering Defendants to return any access codes to Plaintiff's facilities or technology; and

3. Ordering Defendants to return to Plaintiff any electronic data or information taken by Defendants from any of Plaintiff's locations or technology.

Docket 3. Plaintiff alleges that defendants retain access to NLT's "trade secret and proprietary information" and have "exceeded their authorized access to NLT's Data Center by creating a new NLT email address for the purpose of transferring customers over to [d]efendants' new company, Layer8 Solutions, LLC." Docket 4 at 1-2. Plaintiff also alleges that defendants have "poach[ed] [p]laintiff's customers using NLT's trade secrets and proprietary information

contained on the laptop and phone kept by [d]efendants[,]" and "retain possession of [p]laintiff's leased Kia, which poses other concerns and potential liability for NLT if [d]efendants are driving the Kia." *Id.* at 4.

In their response, defendants argue that this court should deny the plaintiff's request for a preliminary injunction or, alternatively, modify the terms of plaintiff's proposed preliminary injunction. Docket 10 at 1. Defendants allege that as part of the parties' buy-out agreement, NLT allowed WE to keep the phone, laptop, and Kia. *Id.* Defendants further argue that plaintiff's "claims regarding account information and sensitive proprietary information . . . are so vague [as] to be unintelligible." *Id.* at 1-2.

In response to defendants' assertion that plaintiff's request for a preliminary injunction is too vague to be enforced, plaintiff categorized its trade secret data into five items: "(1) customer information contained in NLT Stack; (2) [p]laintiff's SSH keys; (3) custom code developed by [p]laintiff for its customers; (4) business information contained in [p]laintiff's work-issued laptop; and (5) business information contained in [p]laintiff's work-issued cellphone." Docket 14 at 8. Plaintiff further argues that it is likely to succeed on the merits of its claims because it alleged that defendants used this information to "fraudulently transfer [p]laintiff's clients to his new business." *Id.* at 2-4.

On November 18, 2024, defendants moved to strike portions of plaintiff's reply (Docket 14) and Wade Randall's submitted affidavit (Docket 15). *See* Docket 16; Docket 17 at 1. Defendants argued that because plaintiff

"attempted to correct its numerous procedural shortcomings in its initial Motion for *Ex Parte* Preliminary Injunction" and defendants did not have a chance to respond, this court should strike plaintiff's new arguments and associated evidence. Docket 17 at 1. Plaintiff argues that granting the motion to strike would be inappropriate here because the reply's allegations are related to its initial motion and defendants have not been prejudiced. *See generally* Docket 18.

## BACKGROUND

### I.    NLT's Business

Founded in 2017, NLT has provided IT technical services and operated a facility and tier-one data center in Sioux Falls, South Dakota. Docket 1 ¶¶ 10, 13. NLT's technical services include "providing hardware, networking, hosting and cloud services, managing services, data backup, digital security, and custom software development." *Id.* ¶ 11. These services also include helping its customers with "website performance, security, and maintenance." *Id.* ¶ 12. Among its services, NLT acts as an Office 365 vendor. Docket 4 at 4. NLT receives Office 365 subscriptions through D&H Distributing and sells these subscriptions to its customers. *Id.*

NLT's Data Center is "a collection of racks of processors, storage devices, and other media" that operates off virtual servers. Docket 15 ¶ 9. To access NLT's Data Center, NLT employs protective access codes and requires two-factor authentication. Docket 1 ¶ 22. To operate the virtual servers, NLT's hypervisors—a virtualization software that "act[s] as a layer between the

4

physical hardware and the multiple unique virtual environments"—require a root access password. Docket 15 ¶¶ 10-11. The root access password provides system-wide access to NLT's Data Center. *Id.* ¶ 11. Further, if an NLT employee wishes to work remotely on NLT projects, the employee must use an SSH key. *Id.* ¶ 24. "An SSH key is a type of public/private key authentication system that allows for remote authentication of a user." *Id.* ¶ 25. NLT employs a service called jump cloud to monitor its SSH keys. *Id.* ¶ 26.

NLT keeps track of its customer list, and specific details about each of its customers, in its customer relationship management (CRM) tool called "NLT Stack." Docket 14 at 2. NLT uses NLT Stack to manage customer relationships and communicate with its clients. *Id.* at 8. NLT Stack also includes information on the contracts between NLT and its customers, and descriptions of the work NLT performs for each customer. Docket 15 ¶ 19. For customers to whom NLT sells an Office 365 subscription, each customer is identified by a unique "Tenant ID." Docket 4 at 4. A Tenant ID is "a globally unique identifier that Microsoft and its vendors use to recognize and administratively manage specific customers." *Id.*

## II.    **Buy-out and Subcontracting Agreement**

As of January 1, 2024, NLT had two members: WE and Leveled Up, LLC. Docket 1 ¶ 27. WE held a 25% membership interest[1] and Leveled Up, LLC held

---

[1] Brandon Wehde, who originally started as a 10% owner of NLT, gradually increased his membership interest to 25%, which he held through his company, WE. Docket 10 at 2.

a 75% membership interest in NLT. Docket 10 at 2. During this time, Wehde, as Chief Technical Officer and part-owner of NLT, ran the Data Center and had knowledge of NLT's confidential information through his exclusive access to the data center via a root access password. Docket 1 ¶¶ 28-29; Docket 15 ¶ 8.

In early 2024, Wehde, as the sole member of WE, notified Wade Randall, President of NLT, that he no longer wanted WE to be a member of NLT. Docket 1 ¶ 32; Docket 12 ¶1. Wehde and Randall negotiated for months about either having WE purchase Randall's membership interests or having Randall purchase WE's membership interests in NLT. Docket 10 at 2. During the parties' negotiations, NLT and WE also discussed entering into a written subcontractor agreement whereby WE would continue as a subcontractor to service NLT's eBay account. Docket 1 ¶ 37; Docket 12 ¶ 18. The parties never signed the subcontractor agreement. Docket 1 ¶ 38; Docket 12 ¶ 19. Additionally, the parties discussed including a non-compete provision in the membership unit purchase agreement; however, the parties did not enter into an agreement containing a non-compete, non-solicitation, or NDA provision. Docket 12 ¶¶ 69-70; *see* Docket 12-1.

On August 5, 2024, but with an effective date of August 1, 2024, NLT, Next Level Group, LLC, and WE executed a membership unit purchase agreement, under which Next Level Group, LLC bought 25% of WE's membership interests in NLT. *See* Docket 12-1. The parties also entered into an oral subcontractor agreement under which WE would service NLT's eBay account and Wehde would transfer his knowledge and access of the Data

6

Center over to NLT's remaining employees. Docket 1 ¶ 43; Docket 12 ¶ 30. The parties agreed that WE would be paid $6,000 per month and that Wehde would submit invoices detailing his services. Docket 1 ¶ 44.

Plaintiff asserts that it paid Wehde's submitted invoices until it discovered that "WE was not providing the services to the Data Center as agreed upon and that [d]efendants were holding NLT's property hostage." *Id.* ¶ 62. On or about October 7, 2024, plaintiff discovered that, prior to October 1, 2024, Wehde transferred NLT employee Alex Koster's Verizon phone line to his personal account. *Id.* ¶ 47. On October 1, 2024, Wehde canceled Koster's phone line because Kosters failed to make payments to Wehde. Plaintiff asserts that Wehde also refused to provide NLT with Wehde's exclusive root access code, which NLT asserts effectively locked it out of its Data Center. *Id.* ¶ 49. On October 10, 2024, NLT had then-employees Kosters and Zach Kerkaert[2] work overnight at the Data Center to resolve the emergency interruption of services. *Id.* ¶¶ 56-57. Plaintiff alleges that because defendants refused to turn over Wehde's exclusive root access code to the Data Center and transfer Koster's phone line back to NLT, defendants caused interruptions in NLT's services so that Wehde's new company, Layer8 Solutions, LLC (Layer8), would benefit.[3] *Id.*

---

[2] Kerkaert was let go from NLT on November 4, 2024. The only remaining members and employees at NLT are Randall and Kosters.

[3] Wehde formed Layer8 Solutions, LLC, a Minnesota limited liability company, on July 16, 2024. Docket 1 ¶ 39.

¶¶ 49-54. After NLT refused to pay the invoices, Wehde canceled the subcontracting agreement. Docket 12 ¶ 30; Docket 28 at 10.

As late as October 31, 2024, plaintiff alleges that Wehde used his login credentials to transfer at least three of plaintiff's Office 365 customers away from NLT to Layer8. Docket 4 at 4-5. Because plaintiff must consent to each transfer,[4] plaintiff alleges that Wehde misled D&H Distributing "to believe that he was both acting on Plaintiff's behalf *and* that he had the authority to transfer Plaintiff's customers to Brandon's new business." Docket 14 at 2. Plaintiff argues that Wehde accessed NLT's private information, using NLT Stack, to obtain the customers' Tenant IDs and "somehow managed to retain his login credentials." Docket 4 at 2, 4.

Wehde asserts that any customers who have transitioned their business from NLT to Layer8 have done so voluntarily. Docket 12 ¶ 73. Testimony from Brian Hakeman, a partner at Dakota CPA, indicated that Dakota CPA left NLT due to problems with its services. Because of these service problems, Dakota CPA left NLT and voluntarily transferred to Layer8 because of a prior relationship between Wehde and Dakota CPA. *Id.*

Wehde also denies impersonating anyone at NLT to "gain access to alleged confidential or proprietary information through alleged 'access permissions' " and denies sending emails from an NLT email account. *Id.* ¶ 75.

---

[4] When "one of [p]laintiff's customers wants to transfer its business to a different [Microsoft Service Provider (MSP)], the new MSP has to give [p]laintiff notice of such a transfer, and [p]laintiff would have to consent to the transfer." Docket 14 at 2.

Wehde asserts that to fulfill the customers' requests to transfer from NLT to Layer8, he submitted a "standard form to allow for the transition of the Microsoft licensing to Layer8." *Id.* As part of submitting the form, Wehde understood that "D&H and/or Pax8 would send a notification to NLT to alert it of any prospective licensing transfer and give it an opportunity to either allow or prohibit the transfer." *Id.* Wehde asserts that one of the transfers may have been prohibited by NLT. *Id.* Wehde also asserts that when he communicated with others following the buy-out, he used an e-mail account from WE, not NLT. *Id.*; *see also* Docket 28 at 14-25.

At the evidentiary hearing, Kosters and Kerkaert testified that Wehde's access to his NLT e-mail was immediately shut-off after the buy-out on August 1, 2024. Kosters testified that while Wehde's access was shut off, Wehde still had root access following the buy-out. Kerkaert testified that Wehde was blocked from accessing his NLT e-mail account and was provided SSH keys limited to what he needed to perform subcontracting work on NLT's eBay account. Kerkaert further testified that as long as NLT employees had access to Wehde's NLT e-mail account, NLT would have root access to NLT's Data Center. Kerkaert also testified that Kosters had a physical access card to get into the Data Center.

Wehde asserts that he was "immediately shut off from accessing [his] prior NLT e-mail account after the buy-out" and does "not know what 'access codes' NLT believes [he] possess[ed] or would need to return." Docket 12 ¶¶ 65-66. Wehde's e-mail account "included a standard password manager called

'Keeper,' which included all the passwords [Wehde] used for accounts." *Id.*
¶ 65. Because Kosters and Kerkaert had access to Wehde's e-mail account,
Wehde argues that both had root access to NLT's Data Center and should have
had the ability to change codes and passwords to the Data Center following
Wehde's buy-out. *Id.* ¶¶ 65, 67.

The parties also dispute ownership of the phone, laptop, and Kia. NLT
argues that it provided Wehde a laptop and phone through NLT's Verizon
account and leased a 2023 Kia EV6 for Wehde to drive. Docket 1 ¶¶ 30-31. NLT
asserts that as part of the oral subcontracting agreement, NLT would continue
to provide WE with the laptop, phone, and Kia for Wehde to perform under the
oral contract. *Id.* ¶¶ 44-45. Defendants argue that Wehde was allowed to keep
his phone and laptop as part of the buy-out. Docket 12 ¶¶ 48, 59. Defendants
assert that Wehde has had his current phone number for over 15 years, long
preceding his start at NLT, and the laptop is WE's property, not NLT's.[5] *Id.*
¶¶ 45, 59; Docket 10 at 6. Defendants cite the lack of a provision requiring
Wehde to turn over his phone and laptop in the membership unit purchase
agreement as evidence that Wehde was not under an obligation to turn over the

---

[5] Defendants argue that when an employee left NLT, it was NLT's standard
protocol to "wipe the employee's computer, install a new Operating System, and
have it ready for the next person." Docket 12 ¶ 57. This protocol was meant to
allow "NLT [to] continue on with business without any interruption" in case a
computer was ever lost or destroyed. *Id.* ¶ 58. Defendants argue that this
protocol does not apply to the current laptop because it is WE's property as
part of the parties' buy-out. *Id.* ¶ 59. Upon notice of this suit, however,
defendants have "wiped the computer, installed a new OS, and made it
available to return if necessary." *Id.* ¶ 61.

phone and laptop to NLT. Docket 12 ¶¶ 52, 54-55. Defendants also argue that during the parties' negotiations over the purchase of WE's membership interests, Randall agreed to allow Wehde, who is a guarantor on the vehicle's lease, to drive the Kia for the remainder of the vehicle's lease. *Id.* ¶ 35. After expiration of the lease, Wehde alleges that it would then be his decision to exercise the option to purchase the Kia. *Id.* ¶¶ 31, 35.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citing *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). Its "primary function . . . is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024) (quoting *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984)). To determine whether preliminary relief such as a preliminary injunction or a temporary restraining order is appropriate, the court considers the following factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on [the nonmovant]; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019) (alterations in original) (internal quotation marks omitted); *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). The *Dataphase* test for preliminary

injunctive relief is a flexible analysis. *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999). Thus, when weighing these factors, "no single factor is in itself dispositive." *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 667 (8th Cir. 1987). "[A]ll of the factors must be considered to determine" whether the balance weighs toward granting the injunction. *Id.*

## DISCUSSION

### I.    Defendants' Motion to Strike

As an initial matter, the court first addresses defendants' motion to strike portions of plaintiff's reply brief in support of its motion for an *ex parte* preliminary injunction and Wade Randall's affidavit because the reply brief and affidavit introduce new evidence and arguments. *See* Docket 17 at 2. Plaintiff opposes the motion to strike and argues that defendants' motion should be denied because Rule 12(f) does not permit motions to strike against non-pleadings, and because the material in the reply and affidavit relate back to arguments raised in the initial briefing. *See* Docket 18 at 3-4, 7-11.

Federal Rule of Civil Procedure Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The district court enjoys "liberal discretion" under Rule 12(f). *Stanbury Law Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir. 2000) (internal quotation marks omitted). "Despite this broad discretion however, striking a party's pleadings is an extreme measure, and, as a result, [the Eighth Circuit has] previously held that

'[m]otions to strike under Fed. R. Civ. P. 12(f) are viewed with disfavor and are infrequently granted.' " *Id.* (quoting *Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir. 1977)).

In moving to strike plaintiff's reply brief and affidavit, defendants attempt to employ Rule 12(f) for an improper purpose because the motion to strike is directed at non-pleadings. *See* Fed. R. Civ. P. 7(a) (defining pleadings as complaints, answers, replies to counterclaims, answers to crossclaims, third-party complaints, and third-party answers). Thus, Rule 12(f) is not a proper avenue for moving to strike plaintiff's reply brief or affidavit. *See, e.g.*, *Agtegra Coop. v. Sacramento Energy Res., L.L.C.*, 2024 WL 4452958, at *3 (D.S.D. Oct. 9, 2024) (reasoning that because a party's brief and affidavit are not pleadings under Rule 7(a), it was appropriate to deny the opposing party's motion to strike); *Buergofol GmbH v. Omega Liner Co.*, 2024 WL 3521802, at *2 (D.S.D. July 24, 2024) (collecting cases holding that a party cannot use Rule 12(f) to strike non-pleadings).

Also, while "[c]ourts do not consider arguments raised for the first time in reply briefs," *Bone Shirt v. Hazeltine*, 2004 WL 7330497, at *1 (D.S.D. Jan. 23 2004) (citing *Navarijo-Barrios v. Ashcroft*, 322 F.3d 561, 564 n.1 (8th Cir. 2003)), "[a] party can . . . respond to an argument made by the opposing party that responded to an issue raised in the opening brief." *Id.* (citing *Anheuser-Busch, Inc. v. John Labatt Ltd.*, 89 F.3d 1339, 1347 (8th Cir. 1994)). The court agrees with plaintiff that the reply brief and Randall's affidavit relate back to plaintiff's opening brief and are responsive to defendants' opposing brief.

Further, defendants were not prejudiced because the evidentiary hearing provided defendants an opportunity to put on evidence in response to plaintiff's submitted evidence. Thus, because it cannot be said that "the challenged allegations have no possible relation or logical connection to the subject matter of the controversy" or "significant[ly] prejudice" the defendants, the court denies defendants' motion to strike. *See Poulos v. Summit Hotel Properties, LLC*, 2010 WL 2034634, at *3 (D.S.D. May 21, 2010) (quoting *Atl. Recording Corp. v. Raleigh*, 2009 WL 1543458, at *2 (E.D. Mo. June 2, 2009)).

## II.    Plaintiff's Motion for an *Ex Parte*[6] Preliminary Injunction

### A.    The Probability of Success on the Merits.

At the evidentiary hearing, the court held that plaintiff failed to show that it is likely to succeed on the merits of its misappropriation of trade secrets claim. *See* Docket 26. "While no single factor is determinative, the probability of success factor is the most significant." *Cigna Corp.*, 103 F.4th at 1342 (quoting *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013)). As such, "the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied." *CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009). Further, the Eighth

---

[6] Plaintiff seeks an *ex parte* preliminary injunction. *See* Docket 3. As the court noted during the evidentiary hearing, a temporary restraining order can be granted *ex parte* because it is of a limited duration. *See* Fed. R. Civ. P. 65(b) (providing that a court may issue an *ex parte* temporary restraining order). The court is not aware of any legal authority to issue an *ex parte* preliminary injunction. As a result, notice was given to defendants and the court held an evidentiary hearing on the motion with both parties participating. *See* Docket 26.

Circuit does not require a "party seeking preliminary relief [to] prove a greater than fifty per cent likelihood that he will prevail on the merits." *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007) (internal quotation marks omitted). And a court determining a party's likelihood of prevailing on the merits does not decide whether the party will actually win. *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991). Thus, "[a]t the early stage of a preliminary injunction motion, the speculative nature of this particular inquiry militates against any wooden or mathematical application of the test." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (citing *Calvin Klein Cosms. Corp. v. Lenox Lab'ys Inc.*, 815 F.2d 500, 503 (8th Cir. 1987)).

At the evidentiary hearing, plaintiff's counsel clarified that plaintiff was seeking a preliminary injunction under the theory of misappropriation of trade secrets under the Defend Trade Secrets Act of 2016 (DTSA). The DTSA creates a private cause of action in favor of the "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b). A trade secret is defined as "information" that exists if:

> (A)    the owner thereof has taken reasonable measures to keep such information secret; and

> (B)    the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3)(A)-(B). A misappropriation occurs, as relevant here, where an individual discloses or uses another's trade secret without their consent and acquires the trade secret "under circumstances giving rise to a duty to maintain the secrecy of trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B); *see also* Docket 1 ¶ 105 (alleging that "[d]efendants acquired NLT's confidential information under circumstances giving rise to a duty to maintain its secrecy or limit its use").

Plaintiff argues that NLT's trade secrets include NLT's customer list, "including specifics regarding customer needs, work history, and preferences[,]" and its source code in NLT Stack. Docket 1 ¶ 101. Plaintiff further clarified in its reply brief that its trade secrets consisted of "(1) customer information contained in NLT Stack; (2) [p]laintiff's SSH keys; (3) custom code developed by [p]laintiff for its customers; (4) business information contained in [p]laintiff's work-issued laptop; and (5) business information contained in [p]laintiff's work-issued cellphone." Docket 14 at 8. NLT argues that defendants have misappropriated the above trade secrets by using and continuing to use access permissions "to fraudulently transfer Plaintiff's customers to, apparently, Defendants' new business." Docket 4 at 4. Plaintiff alleges that Wehde misappropriated NLT's trade secrets by impersonating NLT to mislead D&H Distributing to authorize the transfer of clients from NLT to Layer8 by sidestepping NLT's approval of the transfer. *See id.*; Docket 14 at 3-4.

The court concludes, however, that even if the above information qualifies as trade secrets under the DTSA, there is no specific evidence that

Wehde misappropriated any purported trade secret to the detriment of NLT. The record indicates that in his communications with D&H to transfer NLT's prior clients, Wehde did not claim to be acting on behalf of NLT and did not use an NLT e-mail in his correspondence. *See* Docket 28 at 13-25, 28-32. Plaintiff alleges that "the only way Brandon would have been able to get [the identity of [p]laintiff's 365 customers] is to rely on his access to NLT Stack." Docket 14 at 3. This allegation is not enough to find that defendants misappropriated NLT's trade secrets. *See, e.g.*, *Integrated Process Sols., Inc. v. Lanix LLC*, 2019 WL 1238835, at *5 (D. Minn. 2019) (holding that there was no evidence of misappropriation where plaintiff made the sole, general assertion that defendant "could not be doing the work it was doing without taking trade secrets from" the plaintiff). Rather than poaching clients by relying upon NLT Stack's customer list, clients such as Dakota CPA voluntarily came to Wehde after making the independent decision to leave NLT. *See* Docket 10 at 7. At least in Dakota CPA's case, Dakota CPA chose to join Wehde's new company because it had a previous accountant-client relationship with Wehde. Further, while Randall testified at the evidentiary hearing that Wehde's transfer requests demonstrate that he had access to NLT's proprietary information, *see* Docket 28 at 13-23, 28-32 (detailing emails showing transfer requests between Wehde and D&H), Randall also testified that information such as a client's Tenant ID are visible to NLT's customers. Without some showing that Wehde used NLT's alleged trade secrets to acquire information about NLT's clients— rather than acquiring such information directly from the transferring clients—

17

or evidence that Wehde misled D&H Distributing into approving the client transfers, there is no misappropriation of NLT's trade secrets. *See SiteOne Landscape Supply, LLC v. Beckham*, 2018 WL 324238, at *2-3 (E.D. Mo. Jan. 4, 2018) (holding that there was no evidence of misappropriation where defendant solicited eight to ten of plaintiff's employees but "did not rely on [plaintiff's trade secrets] to determine who to contact since all of these individuals were longtime friends or business acquaintances"); *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 810 (D. Minn. 2018) (holding that there was no misappropriation of a trade secret where the plaintiff failed to produce evidence the defendant used or disclosed a trade secret).

Under the DTSA, plaintiff must show that it took "reasonable measures" to keep its trade secrets confidential. 18 U.S.C. § 1839(3)(A). NLT did take steps to protect its confidential information by completely cutting off Wehde's access to his NLT e-mail account, thereby cutting off his access to his password keeper and root access to the Data Center. *See* Docket 12 ¶ 65. In assessing whether a party has employed reasonable measures, however, "it is important to consider what more [NLT] could have done" to protect its trade secrets. *Prairie Field Servs., LLC v. Welsh*, 497 F. Supp. 3d 381, 397 (D. Minn. 2020). The Eighth Circuit has found it relevant to consider whether a party protects its trade secrets with confidentiality agreements. *See Farmers Edge Inc. v. Farmobile, LLC*, 970 F.3d 1027, 1033 (8th Cir. 2020) (reasoning that a party did not take reasonable efforts to maintain secrecy of information where it "shared the information with a third-party contractor without a confidentiality

agreement and without other policies or practices for safeguarding secrets"). Courts have also found it relevant to consider whether the party has required "senior officers to sign nondisclosure or noncompete agreements." *Prairie Farms Servs.*, 497 F. Supp. 3d at 397 (citing *Prime Therapeutics, LLC v. Beatty*, 354 F. Supp. 3d 957, 968 (D. Minn. 2018). Testimony at the evidentiary hearing revealed that NLT did not maintain written employee handbooks or confidentiality policies. Instead, Randall testified that it was generally understood within the IT industry that certain information should remain confidential. Also, the parties did not agree to a non-compete, non-solicitation, or NDA provision as part of the buy-out. *See* Docket 28 at 3-9. In the absence of a non-compete, non-solicitation, or NDA provision, defendants are not prohibited from working with NLT's prior clients. Therefore, plaintiff lacks "evidence of more stringent measures to protect its alleged trade secrets," and as a result, plaintiff has not "shown that it is likely to succeed on its misappropriation claims [under the DTSA]." *Prairie Field Servs.*, 497 F. Supp. 3d at 397.

Because NLT did not demonstrate a likelihood of success on the merits of its misappropriation of trade secrets claim, this *Dataphase* factor weighs against granting injunctive relief.

## B.    Threat of Irreparable Harm

The court also finds that plaintiff has failed to show it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A movant's failure to demonstrate

irreparable harm is sufficient to deny a motion for preliminary injunction. *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (citing *Watkins Inc.*, 346 F.3d at 844). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (citation omitted). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

Here, plaintiff argues that defendants maintain access to and have downloaded NLT Stack, which defendants have shared with Wehde's new company, Layer8. *See* Docket 1 ¶ 106; Docket 14 at 9 (providing that plaintiff has "tried to disable all of the SSH keys associated with Brandon, but [it is] unable to authenticate whether Brandon created other keys not affiliated with his normal name and login credentials"). Plaintiff asserts that it is reasonable to conclude that Wehde maintains access to NLT's software because it knows that Wehde has "engaged in surreptitious activity to transfer [Plaintiff]'s 365 customers to himself." Docket 14 at 9. Plaintiff also argues that if defendants maintain access to NLT's confidential and proprietary information on the phone and laptop, defendants can continue to use this information to poach NLT's clients and harm NLT's business goodwill and reputation. *See* Docket 4 at 6

(seeking a preliminary injunction to prevent Wehde from "causing further damage with [p]laintiff's vendors" and from "wreak[ing] any further havoc").

This court finds that the alleged harm is too speculative. *See S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012) ("Speculative harm does not support a preliminary injunction."). While NLT has lost clients to Layer8, testimony at the evidentiary hearing from Brian Hakeman at Dakota CPA and from Wehde revealed that these clients voluntarily came to Layer8 because of a prior relationship between the parties. *See also* Docket 10 at 7 (providing that "several customers voluntarily left NLT and transitioned to Layer8 Solutions"). "Moreover, there is no non-solicitation [or noncompete] agreement between the parties" that prohibits defendants from working with NLT's previous customers. *Beckham*, 2018 WL 324238, at *2.

In acquiring these clients, plaintiff has not shown that defendants retain access to NLT Stack or root access to NLT's Data Center. Instead, testimony from other NLT employees and Wehde indicates that Wehde's access to his NLT e-mail was shutoff immediately upon the buy-out and NLT can change its passwords and root access codes. *See also* Docket 12 ¶ 65 (asserting that Wehde's access was shut off after the buy-out). Because plaintiff has failed to provide a specific example of proprietary and confidential information that remains on Wehde's phone and laptop, it is mere speculation on plaintiff's part that Wehde somehow maintains access to NLT's Data Center. Thus, there is little evidence to conclude that defendants face an irreparable harm in the absence of a preliminary injunction.

Further, even if plaintiff eventually proves that defendants misappropriated trade secrets to transfer clients from NLT to Layer8, that harm is compensable by money damages. *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) ("[A]ny harm [plaintiff] may suffer in the form of lost customers and lost profits is quantifiable and compensable with money damages . . . meaning this harm is not irreparable.") (citing *Gen. Motors Corp.*, 563 F.3d at 314); *Guy Carpenter & Co. v. John B. Collins Assocs.*, 179 F. App'x 982, 983 (8th Cir. 2006) ("[D]amages are an adequate remedy for any breach because clients who leave Carpenter can be identified and the damages resulting from the loss of those clients can be calculated."). As such, because any harm that has occurred can be remedied through damages, injunctive relief is not necessary. *See Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 300 (8th Cir. 1996) (holding that preliminary injunctive relief is unavailable where a plaintiff had "an adequate remedy at law, namely, the damages and other relief to which she will be entitled if she prevails").

Plaintiff has not presented enough evidence in its briefings or on the record that establishes a "harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (citation omitted). Thus, for these reasons, the court concludes that the second *Dataphase* factor weighs against issuing a preliminary injunction.

### C.    Balance of the Hardships

The third *Dataphase* factor requires movants to establish that its irreparable harm is greater than the hardship that a preliminary injunction would cause the opposing party. *Sturgis Area Chamber of Commerce v. Sturgis Rally & Races, Inc.*, 99 F. Supp. 2d 1090, 1101 (D.S.D. 2000). Plaintiff argues that because defendants are holding the laptop, phone, and Kia hostage, "[d]efendants' actions threaten to destroy and disrupt [p]laintiff's business." Docket 4 at 5. As the court determined above, however, plaintiff has failed to demonstrate that it suffers a threat of irreparable harm that would warrant issuance of an injunction. On the other hand, the harm to Wehde from turning the phone, laptop, and Kia over to plaintiff at this point in the proceedings would be unnecessary and excessive. Thus, the third *Dataphase* factor weighs against injunction.

### D.    Public Interest

The final *Dataphase* factor requires the court to determine whether the public interest would be served by granting the movant's motion for injunctive relief. *Dataphase*, 640 F.2d at 113. Because "this is largely a dispute between private parties . . . there is little interest to the public." *Ellingson Drainage, Inc. v. Kippen*, 2023 WL 4706058, at *7 (D.N.D. July 24, 2023). Public interest favors "preserving and fostering business competition." *Dwyer*, 294 F. Supp. 3d at 819 (citing *Lasermaster Corp. v. Sentinel Imaging, Inc.*, 931 F. Supp. 628, 637 (D. Minn. 1996)). This interest, however, "does not extend to unfair competition." *Id.* (citing *Millard v. Elec. Cable Specialists*, 790 F. Supp. 857, 863

(D. Minn. 1992)). In the absence of a non-compete or non-solicitation provision, issuing a preliminary injunction would not serve to benefit the public interest. *See N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984) (noting that "the public interest calls for [the] enforcement" of valid noncompete agreements). Thus, the final *Dataphase* factor does not weigh in favor of issuing an injunction.

## CONCLUSION

After careful consideration of the *Dataphase* factors, the court concludes that plaintiff has not met its burden of showing that a preliminary injunction should be issued. The court also concludes that defendants' motion to strike plaintiff's reply brief and corresponding affidavit should be denied. Thus, it is

ORDERED that plaintiff's motion for an *ex parte* preliminary injunction (Docket 3) is denied. It is

FURTHERED ORDERED that defendants' motion to strike (Docket 16) is denied.

Dated December 13, 2024.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE