UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| NEXT LEVEL TECHNOLOGY GROUP, LLC, a South Dakota Limited Liability Company, | 4:24-CV-04199-KES |
| Plaintiff, | |
| vs. | ORDER GRANTING DEFENDANT WEHDE'S MOTION TO DISMISS AND DENYING DEFENDANT WEHDE ENTERPRISES' MOTION TO DISMISS |
| WEHDE ENTERPRISES, LLC, a South Dakota Limited Liability Company, and BRANDON WEHDE, individually, | |
| Defendants. | |

Defendants Wehde Enterprises (WE) and Brandon Wehde (Wehde) filed two separate motions to dismiss plaintiff's, Next Level Technology Group (NLT), first amended complaint. *See* Dockets 54, 55. Wehde moves to dismiss the entirety of the first amended complaint. Docket 54. WE moves to dismiss NLT's claims for unjust enrichment, fraudulent misrepresentation, conversion, a violation under the Stored Communications Act (SCA), and misappropriation of trade secrets under the Defend Trade Secrets Act (DTSA), arguing that each claim is barred by the independent tort doctrine. Docket 55 at 1-2. WE also moves to dismiss NLT's claims for fraudulent misrepresentation, recission, and piercing the corporate veil for failure to state a claim and moves to dismiss NLT's claim for punitive damages if NLT's underlying tort claims are dismissed.

*Id.* at 2. NLT opposes both motions to dismiss. Docket 57. The court issues the following order.

## BACKGROUND

### I.    PROCEDURAL BACKGROUND

On October 31, 2024, NLT filed suit alleging various state and federal claims against both defendants. *See* Docket 1 at 8-13. NLT also moved for an ex parte preliminary injunction against defendants. Docket 3. The court held an evidentiary hearing regarding the preliminary injunction on December 3, 2024, Docket 26, and ultimately denied NLT's motion, Docket 29 at 24. Prior to the evidentiary hearing, on November 26, 2024, WE filed a motion to dismiss five of NLT's claims. Docket 22. On the same day, Wehde filed a motion to dismiss every claim against him. Docket 23. On March 10, 2025, NLT filed its first amended complaint. Docket 40.

NLT brought the following claims in its first amended complaint: Count I: Breach of Oral Contract; Count II: Unjust Enrichment; Count III: Fraudulent Misrepresentation; Count IV: Conversion; Count V: Tortious Interference with Business Relationships and/or Expectancies; Count VI: Violation of the SCA under 18 U.S.C. § 2701; Count VII: Misappropriation of Trade Secrets in Violation of 18 U.S.C. § 1836; Count VIII: Recission; Count IX: Punitive Damages; and Count X: Piercing the Corporate Veil. *Id.* at 10-17. Counts I, III, and VIII are only brought against defendant WE. *Id.* at 10-11.

On May 7, 2025, defendants filed separate motions seeking to dismiss NLT's first amended complaint. *See* Dockets 54, 55. Defendant Wehde moves to

dismiss all claims alleged against him personally on the basis that NLT failed to plausibly allege that Wehde "engaged in conduct outside the scope of his membership in [WE] and/or to pierce the corporate veil." Docket 56 at 1. Defendant WE argues that Counts II, III, IV, V, and VI should be dismissed because the claims are barred by the independent tort doctrine. *See id.* at 14-17. WE also asserts that Counts III, VIII, and X should be dismissed for failure to state a claim, and NLT's claim for punitive damages should be dismissed if the underlying tort claims are dismissed. *Id.* at 17-19.

## II.   FACTS ALLEGED IN THE FIRST AMENDED COMPLAINT

When reviewing a motion to dismiss under Rule 12(b)(6), this court accepts the facts alleged in the complaint as true and construes all reasonable inferences in the light most favorable to the plaintiff. *See Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008); *Cathedral Square Partners Ltd. P'ship v. S.D. Hous. Dev. Auth.*, 966 F. Supp. 2d 862, 867 (D.S.D. 2013). The court first outlines NLT's business operations and then discusses the parties' buy-out and subcontracting agreements.

### A. NLT's Business and Data Center

Since its formation on August 4, 2017, NLT has provided IT technical services and operated a facility and tier-one data center in Sioux Falls, South Dakota. Docket 40 ¶¶ 9-10, 14. NLT's technical services include "providing hardware, networking, hosting and cloud services, managing services, data backup, digital security, and custom software development." *Id.* ¶ 11. These services also include helping its customers with "website performance, security,

3

and maintenance." *Id.* ¶ 12. NLT also "assists its customers with storage and security of electronic communications through its hosting of websites and proprietary applications via its Data Center." *Id.* ¶ 21. When a customer wishes to transfer services provided by NLT, NLT works with D&H Distributing to transfer specific licenses to other service providers. *Id.* ¶ 13.

To access NLT's Data Center, NLT employs protective access codes and requires two-factor authentication. *Id.* ¶ 23. As such, "[m]uch of the information stored and maintained at the Data Center is not readily accessible to the public." *Id.* ¶ 22. NLT also protects this information "through locked premises, restricted access to physical documents, [keeping it] . . . in locations that are separate from the public eye." *Id.* ¶ 24. Such protected information consists of confidential customer, sales, and vendor information. *Id.* at ¶¶ 24-25, 27. To maintain "its relationships and goodwill with customers, employees, and vendors . . . NLT keeps all information related to such customers and vendors secret and requires its employees not to divulge such information to third parties." *Id.* ¶ 20.

## B. Buy-Out and Subcontracting Agreement

As of January 1, 2024, NLT had two members: WE[1] and Leveled Up, LLC. *Id.* ¶ 32. Wehde oversaw the Data Center, having exclusive access to the Data Center via a master access code. *Id.* ¶ 33. In early 2024, Wehde, as the sole

---

[1] Prior to January 1, 2023, Wehde personally held membership units in NLT. Docket 40 ¶ 28. On January 1, 2023, Wehde transferred his NLT membership units to WE. *Id.*

member of WE, notified Wade Randall, President of NLT, that he no longer wanted WE to be a member of NLT. *Id.* ¶¶ 36, 150. NLT's two members negotiated for months regarding Next Level Group, LLC's purchase of WE's membership units. *Id.* ¶ 40. During the parties' negotiations, NLT and WE "discussed the possibility of WE continuing on as a subcontractor of NLT for the purpose of [Wehde] transitioning his duties and his exclusive access to the Data Center over to other NLT employees." *Id.* ¶ 41. The parties never signed a written subcontractor agreement, *id.* ¶ 42, but on August 1, 2024, WE, NLT, Leveled Up, LLC, and Next Level Group, LLC executed documents for Next Level Group, LLC's purchase of WE's membership units in NLT, *id.* ¶ 46.

In addition to the membership unit purchase agreement, NLT and WE entered into an oral agreement "where WE would continue to provide services to the Data Center and transition [Wehde's] knowledge of an exclusive access to the Data Center smoothly over to NLT's employees." *Id.* ¶ 47. Pursuant to the agreement, WE would receive $6,000 per month to maintain NLT's largest client account and WE agreed that it would respond to any support requests sent to its support email within 48 hours. *Id.* ¶¶ 48-49. The parties also agreed that WE could charge separately for any work outside the oral agreement. *Id.* ¶ 49.

Prior to the buy-out and subcontracting agreements, NLT provided Wehde with a laptop and a phone through NLT's Verizon account. *Id.* ¶ 31. On February 9, 2023, Wehde—identifying himself as the CEO and managing member of NLT—entered a co-lease with NLT for a 2023 Kia EV6 (the Kia). *Id.*

¶ 29. NLT was the primary lessee and Wehde was the co-lessee. *Id.* Additionally, NLT paid the Kia's insurance. *Id.* ¶ 30. Under the parties' oral subcontracting agreement, NLT agreed that it would continue to provide WE with the laptop, phone, and Kia. *Id.* ¶ 48. In exchange for Wehde and WE's performance under the oral subcontracting agreement, NLT agreed that it would pay off the Kia's lease and keep the vehicle on NLT's insurance. *Id.* ¶ 50. NLT alleges that, "[u]pon information and belief, the Kia continues to be used by [Wehde] as his personal vehicle." *Id.* ¶ 51.

During this same period, Wehde created two limited liability companies. Wehde first created a South Dakota limited liability company, Layer8 Solutions, LLC (SDLayer8) on January 19, 2024. Docket 40 ¶ 35. WE was a beneficial owner of SDLayer8. *Id.* SDLayer8 was later terminated on September 24, 2024, after termination paperwork was submitted to the South Dakota Secretary of State. *Id.* ¶ 52. On July 16, 2024, Wehde formed a Minnesota limited liability company, Layer8 Solutions, LLC (MNLayer8). *Id.* ¶ 43. MNLayer8 received a Certificate of Good Standing in Minnesota on September 25, 2024. *Id.* ¶ 54. NLT alleges that Wehde created MNLayer8 "for the purpose of competing against NLT using NLT's proprietary information" because after reviewing MNLaer8's website, "it provides the same or similar services as NLT." *Id.* ¶¶ 44-45. On September 27, 2024, MNLayer8 was registered as a foreign limited liability company in South Dakota. *Id.* ¶ 56.

On October 8, 2024, Wehde informed NLT that "effective immediately," WE would cease all services provided to NLT and that "any further attempts to

6

contact WE for services or other additional work shall be rejected." *Id.* ¶ 57. On or around October 7, 2024, NLT discovered that during March of 2024, Wehde and WE obtained access to NLT's Verizon account and transferred Wehde's and two other NLT employees' phone lines out of NLT's Verizon account. *Id.* ¶¶ 37, 63. One of the employee's phone lines included NLT's main technician phone line. *Id.* ¶ 37. Wehde and WE refused to transfer the main technician's phone line back to NLT unless NLT paid Wehde's and WE's phone bill. *Id.* ¶ 66. Because NLT did not have access to the main technician's phone line, which was required to properly provide services to NLT's customers, the main technician's phone line was shut off. *Id.* ¶¶ 67-68.

Wehde and WE also refused to provide NLT with "[Wehde's] exclusive use of the access codes to the Data Center, which led NLT to believe that it could not access electronic communications, general security, and operations of and within its own Data Center." *Id.* ¶ 65. NLT alleges that Wehde and WE "held the access codes, the laptop, and the main technician's phone line hostage to purposefully cause interruptions to NLT's services" and "to benefit [Wehde's] new company, MNLayer8." *Id.* ¶¶ 69-70.

On or around October 10, 2024, NLT notified its customers that an emergency occurred at the Data Center requiring maintenance. *Id.* ¶ 71. NLT sent Zach Kerkaert, its technician,[2] to the Data Center to resolve the emergency interruption in services. *Id.* ¶¶ 72-73. Kerkaert informed NLT that

---

[2] Kerkaert is no longer an employee at NLT. Docket 40 ¶ 75.

he worked overnight to get services operating at the Data Center, however, Kerkaert later admitted that he lied to NLT about working overnight in order to receive payment for work he failed to complete. *Id.* ¶¶ 74, 76. NLT alleges that Wehde and WE worked with Kerkaert to "further perpetuate fraud and injustice upon NLT for the purposes of wasting NLT's resources." *Id.* ¶ 77.

NLT discovered that on September 25, 2024, Wehde and WE, "fraudulently used their access to NLT customer information and transferred Dakota CPA's Cloud Service Provider from NLT to WE and MNLayer8." *Id.* ¶ 55. NLT also discovered that on October 14, 2024, despite the cancellation of the oral agreement, "Wehde and WE, once again using access to NLT's customer information, began to fraudulently transfer Sioux Valley Environmental's services to WE and [MN]Layer8."[3] *Id.* ¶ 58. NLT also learned that "WE was billing NLT for hours of alleged services requested by NLT that were not responded to within 48 hours or were not responded to at all." *Id.* ¶ 81. NLT also continued to pay the invoices submitted by WE, which were sent twice a month for $3,000 plus tax, until it discovered that WE was not providing the services to the Data Center as agreed. *Id.* ¶¶ 80, 82.

---

[3] NLT argues that based on Wehde's testimony at the preliminary injunction hearing that he never had access to the Data Center, NLT is unsure when Wehde and WE lost access to the Data Center. *See* Docket 40 ¶¶ 59-60. NLT alleges that Wehde and WE "obtained alternate and unauthorized access in order to transfer NLT's customers over to WE and MNLayer8." *Id.* ¶ 61. NLT also alleges that if Wehde and WE did not have access to the Data Center, "then [Wehde] and WE fraudulently represented any and all work NLT paid for under the oral agreement." *Id.* ¶ 62.

## LEGAL STANDARD

A court may dismiss a complaint under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To avoid dismissal under Rule 12(b)(6), a plaintiff must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is facially plausible where its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court's assessment of whether the complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## DISCUSSION

### I.   Defendant Wehde's Motion to Dismiss

The court first addresses Wehde's motion to dismiss NLT's claims for unjust enrichment, conversion, tortious interference with business relationships and/or expectancies, a violation of the SCA, and misappropriation of trade secrets under the DTSA against Wehde individually. Docket 54; *see also* Docket 40 at 11-15. Wehde does not challenge the sufficiency of the pleading of those claims. *See generally* Docket 56. Instead, Wehde argues that NLT's claims are against WE, not himself as an individual. *See id.* at 8-9; *see also* Docket 58 at 3 ("NLT does not make *any* separate claims against [Wehde] individually."). Wehde concludes that because he "was not personally a member of NLT or party to any alleged agreements," all the claims

against him in the first amended complaint must be dismissed because NLT fails to "plead any factual allegations related to the elements for piercing the corporate veil." Docket 56 at 9 (emphasis omitted).

"State law is viewed to determine whether and how to pierce the corporate veil." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 649 (8th Cir. 2003). Generally, "a corporation is to be considered a legal entity separate and distinct from its shareholders, officers, and directors unless and until there is sufficient reason to the contrary." *Brevet Int'l, Inc. v. Great Plains Luggage Co.*, 604 N.W.2d 268, 273 (S.D. 2000). While a limited liability company is not a corporation, it affords its members limited liability protection similar to a corporation. *See Smith v. Rustic Home Builders, LLC*, 826 N.W.2d 357, 359 (S.D. 2013). "The concept of limited liability is considered one of the central purposes for choosing the corporate form, because it permits shareholders to limit their personal liability to the extent of their investment." *Brevet*, 604 N.W.2d at 274. "[B]ut when the notion of a legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, then sufficient reason will exist to pierce the corporate veil." *Kan. Gas & Electric Co. v. Ross*, 521 N.W.2d 107, 112 (S.D. 1994); *see also Hyde v. Hyde*, 99 N.W.2d 788, 792 (S.D. 1959) (holding that an "entity may be disregarded where the corporation is the mere alter ego or business conduit of an individual").

In determining whether to pierce the corporate veil, South Dakota courts apply a two-part test: (1) whether a unity of interest and ownership exists, and (2) whether "adherence to the fiction of separate corporate existence sanction[s]

10

fraud, promote injustice, or inequitable consequences or lead to an evasion of legal obligations." *Kan. Gas & Elec. Co.*, 521 N.W.2d at 112. Under the separate corporate identity prong, four factors are considered: "(1) undercapitalization; (2) failure to observe corporate formalities; (3) absence of corporate records; and (4) payment by the corporation of individual obligations." *Id.* at 112-13. "If these [four] factors are present in sufficient number and/or degree, the first prong is met and the court will then consider the second prong." *Id.* at 113.

"Under the fraud, injustice, or evasion of obligations prong of the test, [South Dakota courts] ask whether there is adequate justification to invoke the equitable power of the court." *Id.* (citation omitted). In determining whether this prong is met, South Dakota courts consider the following two factors: (1) whether there has been fraudulent misrepresentation by corporate officers or directors; and (2) whether the entity has been used to promote fraud, injustice, or illegality. *Id.* If both prongs of the test are met and "the court deems it appropriate to pierce the corporate veil, the corporation and its stockholders will be treated identically." *Id.* (internal quotation marks omitted).

The court finds that NLT has failed to plausibly allege that the separate corporate identity prong is satisfied. As Wehde notes, "there are no allegations regarding undercapitalization at the time of [WE's inception], . . . no allegations regarding failure to adhere to corporate formalities, no allegations regarding the absence of corporate records, [and] no allegations of personal obligations." Docket 56 at 10 (emphasis omitted). Even NLT acknowledges that it "has not alleged specifically that WE is undercapitalized." Docket 57 at 5. Instead, NLT

argues that it has sufficiently alleged that WE's corporate veil should be pierced because it need not "plead every factor to survive a motion to dismiss an action to plead the corporate veil." *Id.* NLT concludes that it has sufficiently alleged that WE's corporate veil should be pierced because it has "alleged fraudulent representation and facts arguing that [Wehde] should not be allowed to use WE to promote fraud, injustice, or illegality." *Id.*

The Supreme Court of South Dakota has made clear that only if the separate corporate identity prong is present will the court "then consider the [fraud, injustice, or evasion of obligations] prong." *Kan. Gas & Elec. Co.*, 521 N.W.2d at 113; *see also Brevet*, 604 N.W.2d at 274. Here, NLT fails to allege any factual allegations that would demonstrate the four factors under the separate corporate identity prong "are present in sufficient number and/or degree." *Kan. Gas & Elec. Co.*, 521 N.W.2d at 113. The closest NLT comes to alleging some form of failure to adhere to corporate formalities consists of its allegations that Wehde exercised complete control over WE's operations, and that Wehde is the sole member or owns all or most of WE. *See* Docket 40 ¶¶ 150-51. But a "[g]enuine corporate organization, even when adopted for the express purpose of avoiding personal liability, is not to be lightly disregarded, and [the] mere failure upon occasion to follow all the forms prescribed by law for the conduct of corporate activities will not justify such disregard." *Kan. Gas & Elec. Co.*, 521 N.W.2d at 115 (internal quotation marks omitted). The court concludes that NLT's conclusory allegations alone are insufficient to establish a prima facie case to pierce the corporate veil. *See Richardson v. BNSF Railway*

*Co.*, 2 F.4th 1063, 1068 (8th Cir. 2021) ("Mere conclusory statements and factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the defendant is liable." (citations omitted and cleaned up)).

Additionally, even if the court were to only consider NLT's argument that it has established a prima facie case because it made allegations related to the fraud, injustice, or inequitable consequences prong, *see* Docket 57 at 5, the court is still not convinced that NLT has made a sufficient showing to establish a prima facie case to pierce the corporate veil. To satisfy the second prong, NLT needed to allege a "misuse of the corporate form." *See Kan. Gas & Elec. Co.*, 521 N.W.2d at 113 (quoting *N.L.R.B. v. Greater Kan. City Roofing*, 2 F.3d 1047, 1052-53 (10th Cir. 1993)); *see also Paul v. Bathurst*, 997 N.W.2d 644, 653 (S.D. 2023) (requiring some "abuse of the corporate privilege and . . . an inequitable result"). Additionally, "[i]t is only when the shareholders disregard the separateness of the corporate identity *and when that act of disregard causes the injustice or inequity or constitutes the fraud* that the corporate veil may be pierced." *Kan. Gas & Elec. Co.*, 521 N.W.2d at 113 (quoting *Greater Kan. City Roofing*, 2 F.3d at 1052-53).

The court finds that NLT has failed to allege that Wehde took some action outside of his role as a member of WE that worked some fraud upon NLT. The claims in the first amended complaint alleged against Wehde are built upon allegations that both defendants acquired, misappropriated, and obtained unauthorized access of NLT's confidential information and property. *See*

Docket 40 ¶¶ 91-94, 102-135. But NLT fails to explain what specific conduct Wehde engaged in that fell outside the scope of his membership in WE.

For example, the membership unit purchase and subcontracting agreements were between NLT and WE, not NLT and Wehde. *See* Docket 40 ¶¶ 47-50. As part of NLT's and WE's oral subcontracting agreement, NLT agreed that it would pay WE for its services and "would continue to provide WE with the laptop, phone, and Kia." *See id.* ¶¶ 48-49. NLT additionally alleged that it agreed to "pay off the lease of the Kia and keep the vehicle on NLT's insurance" to continue "provid[ing] the Kia to [Wehde] and WE in order for [Wehde] and WE to perform under the oral agreement to its conclusion in good faith." *Id.* ¶ 50. But these allegations fail to demonstrate what conduct Wehde engaged in individually that exceeded the scope of his membership in WE. Moreover, Wehde's continued access to the laptop, phone, Kia, and access codes was due to the agreement entered into between WE and NLT. And "the mere fact that a corporation . . . breaches a contract . . . does not mean that the individual shareholders of the corporation should personally be liable." *Kan. Gas & Elec. Co.*, 521 N.W.2d at 113 (quoting *Greater Kan. City Roofing*, 2 F.3d at 1052-53).

Thus, without any "factual allegations supporting piercing, such as undercapitalization, commingling of funds, absence of corporate records, corporate payment of individual obligations, or other facts that would indicate some type of corporate fraud," the court finds that NLT has failed to plausibly allege a prima facie case to pierce the corporate veil or allege a claim against

14

Wehde individually. *See Superior Homes, L.L.C., v. Comardelle*, 2013 WL
6146051, at *4 (D.S.D. Nov. 21, 2013) (dismissing claims against member of
limited liability company because the plaintiff failed to allege facts supporting
piercing the corporate veil under South Dakota law). As such, the court grants
Wehde's motion to dismiss all the claims asserted against him individually.

## II.     **Defendant WE's Motion to Dismiss**

Defendant WE challenges several of NLT's claims in its motion to
dismiss. *See* Docket 55; Docket 56 at 14-19. First, WE argues that NLT's
claims for unjust enrichment, fraudulent misrepresentation, conversion, a
violation of the SCA, and misappropriation of trade secrets under the DTSA
should be dismissed because each claim is barred by the independent tort
doctrine. *See* Docket 55 at 1; Docket 56 at 14. Second, WE challenges the
sufficiency of NLT's claims for fraudulent misrepresentation and recission on
the grounds that NLT fails to state a claim upon which relief can be granted.
Docket 55 at 2; Docket 56 at 17-18. Third, WE argues that NLT's claim for
punitive damages should be dismissed "in the event the underlying tort claims
for punitive damages are dismissed."[4] Docket 55 at 2; Docket 56 at 19.

---

[4] The court rejects WE's argument that NLT's claim for punitive damages
should be dismissed "in the event the underlying tort claims for punitive
damages are dismissed," because neither WE nor Wehde challenged NLT's
claim for tortious interference with business relationships and/or expectancies.
*See* Docket 54; Docket 55. Because neither defendant challenges this claim,
NLT may recover punitive damages. *See, e.g.*, *Selle v. Tozser*, 786 N.W.2d 748,
758 (S.D. 2010) (finding that evidence used to prove tortious interference can
also be used to support claim for punitive damages); *see also McGreevy v.
Daktronics, Inc.*, 156 F.3d 837, 843 (8th Cir. 1998) (holding that a plaintiff was
unable to recover punitive damages because the plaintiff failed to prove

WE argues that NLT's claims for unjust enrichment, fraudulent misrepresentation, conversion, a violation of the SCA, and misappropriation of trade secrets under the DTSA should be dismissed because each claim is barred by the independent tort doctrine. *See* Docket 55 at 1; Docket 56 at 14. "Tort liability requires 'a breach of a legal duty independent of contract.'" *Schipporeit v. Khan*, 775 N.W.2d 503, 505 (S.D. 2009) (quoting *Grynberg v. Citation Oil & Gas Corp.*, 573 N.W.2d 493, 500 (S.D. 1997)). The South Dakota Supreme Court has recognized that "a breach of duty may arise from a contractual relationship, and while matters complained of may have their origin in contract, the gist of an action may be tortious." *Id.* (quoting *Kunkel v. United Sec. Inc. Co. of N.J.*, 168 N.W.2d 723, 733 (S.D. 1969). But the independent tort doctrine provides that "a negligence action cannot arise out of a contractual relationship unless there is a legal duty on behalf of the defendant which arises independent of the duties owed under the contract." *Rozone Prods., LLC v. Raczkowski*, 2012 WL 13172982, at *5 (D.S.D. June 4, 2012). Stated another way,

> [t]he independent tort must be separate and distinct from the breach of contract. While the intentional tort may occur at the time of and in connection with the breach, or may arise out of the same transaction, it is not committed merely by breaching the contract even if such action is intentional.

*Fisher Sand & Gravel Co. v. S.D. Dep't of Transp.*, 558 N.W.2d 864, 868 (S.D.1997) (internal quotation marks omitted).

---

elements of his tortious interference claim). Thus, the court denies WE's motion to dismiss NLT's claim for punitive damages.

### A.    Unjust Enrichment

The court first rejects WE's argument that NLT's claim for unjust enrichment should be dismissed because it is barred by the independent tort doctrine. The Federal Rules of Civil Procedure permit parties to plead in the alternative. *See* Fed. R. Civ. P. 8(d)(2). As such, NLT may plead its unjust enrichment claim in the alternative to its breach of contract claim without fear of dismissal. *See id.*; *see also Lundstrom v. Daniel M. Homolka P.A.*, 2020 WL 1891696, at *5 (D.S.D. Apr. 16, 2020) (collecting cases from the South Dakota Supreme Court to conclude that a plaintiff could plead unjust enrichment as "an alternative theory of recovery to his breach of contract claim"). Thus, dismissal of NLT's alternatively pleaded unjust enrichment claim would be inappropriate at this stage.

### B.    SCA and DTSA

Additionally, the court rejects WE's argument that NLT's claims for a violation under the SCA, and misappropriation of trade secrets under the DTSA should be dismissed because each is barred by the independent tort doctrine. *See* Docket 56 at 16. WE fails to point to any legal authority applying the independent tort doctrine to such claims. *See id.*; *see also* Docket 58 at 7. Additionally, the court finds that because NLT's SCA and DTSA claims rely upon factual allegations that are distinct from the allegations supporting NLT's claim for breach of contract, the two claims are not barred by the independent tort doctrine.

The SCA creates a private right of action against anyone who "(1) intentionally accesses without authorization a facility through which an electronic communications services is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage." *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 838 (8th Cir. 2015) (quoting 18 U.S.C. § 2701(a)). The Eighth Circuit has compared unauthorized access and access exceeding authorization under the SCA to the principles of common law trespass. *See id.* at 839. NLT alleges that WE exceeded its provided access or obtained unauthorized access to NLT's Data Center. *See* Docket 40 ¶¶ 120-26. For example, NLT alleges that WE exceeded its access by transferring clients from NLT to MNLayer8. *See id.* ¶¶ 55, 58. These allegations are different than the allegations against WE regarding the breach of contract cause of action. *Id.* ¶¶ 84-90 (alleging that WE breached the contract "by failing to provide services to the Data Center and provide a smooth transition over to NLT's employees for control and access to the Data Center").

Similarly, NLT's allegations related to its DTSA claim differ from its allegations that claim a breach of contract. The DTSA "require[s] a two-step inquiry: first, the court must decide whether [the plaintiff] has a protectable trade secret, and second . . . whether any of the defendants misappropriated the trade secrets." *Viet Family, Inc. v. Freidel*, 754 F. Supp. 3d 840, 847 (D.S.D. 2024) (quoting *Jim Hawk Truck-Trailers of Sioux Falls, Inc. v. Crossroads Trailer Sales & Serv., Inc.*, 655 F. Supp. 3d 825, 842 (D.S.D. 2023)). NLT alleges that it

18

has a protectable trade secret, *see* Docket 40 ¶¶ 127-31, and that WE

misappropriated this trade secret by holding NLT's access codes to the Data

Center, the Kia, and the phone to benefit MNLayer8, *id.* ¶ 133. These

allegations differ from NLT's breach of contract allegations. *See id.* ¶¶ 84-90.

Thus, because NLT's allegations that support its SCA and DTSA claims are

distinct from its allegations that support its breach of contract claim, neither

claim is barred by the independent tort doctrine.

###   C.    Fraudulent Misrepresentation

WE argues that NLT's claim for fraudulent misrepresentation should be

dismissed because NLT has failed to plead the claim with particularity. Docket

56 at 17-18; Docket 58 at 7. Under South Dakota law, the elements for a claim

of fraudulent misrepresentation are as follows:

1) A defendant made a representation as a statement of fact;
2) The representation was untrue;
3) The defendant knew the representation was untrue or he made the representation recklessly;
4) The defendant made the representation with intent to deceive the plaintiff and for the purpose of inducing the plaintiff to act upon it;
5) The plaintiff justifiably relied on the representation; and
6) The plaintiff suffered damage as a result.

*Est. of Johnson ex rel. Johnson v. Weber*, 898 N.W.2d 718, 729 (S.D. 2017). "In

South Dakota, a civil pleading based on fraud is sufficiently particular if it

alleges 'all of the essential elements of actionable fraud.' " *N. Am. Truck &*

*Trailer, Inc. v. M.C.I. Comm. Servs. Inc.*, 751 N.W.2d 710, 713 (S.D. 2008)

(quoting *Holy Cross Parish v. Huether*, 308 N.W.2d 575, 576 (S.D. 1981)).  WE

argues that NLT fails to make allegations satisfying the second and fourth elements. *See* Docket 56 at 18; Docket 58 at 7-8.

In its first amended complaint, NLT alleges that WE represented that it would provide services to the Data Center based on access codes it already possessed. *See* Docket 40 ¶¶ 95-96. NLT specifically alleges that this representation was "untrue" and that WE knew it was untrue as evidenced by Wehde's testimony that WE did not have access to the Data Center. *See id.* ¶¶ 97-98. NLT specifically alleges that WE used the oral agreement with NLT to provide "services with an ulterior motive to damage NLT's business and benefit itself." *Id.* ¶ 99. NLT also alleges that it justifiably relied upon and was damaged by WE's misrepresentation. *Id.* ¶¶ 100-01. Viewing the facts in the light most favorable to NLT, the court holds that NLT has plausibly stated a claim for fraudulent misrepresentation.

WE also argues that NLT's claim for fraudulent misrepresentation should be dismissed because it is barred by the independent tort doctrine. *See* Docket 56 at 15. WE asserts that because NLT's claim for fraudulent misrepresentation essentially alleges that WE failed to perform under the contract, WE's "alleged failure to perform under the oral agreement would be governed by contract and not a tort claim." *Id.* NLT argues that WE should not be able to use the parties' contract as a shield from tort liability. *See* Docket 57 at 16-20.

The South Dakota Supreme Court first applied the independent tort doctrine in *Smith v. Weber*, 16 N.W.2d 537 (1944). There, a tenant sued his

landlord who had tried to force him out of his apartment by shutting off the tenant's heat, water, and telephone, causing debris from a remodeling job to destroy some of the tenant's personal property, and burning garbage in the building's furnace. *Weber*, 16 N.W.2d at 538. The court reasoned that the landlord had a separate tort duty to respect the rights of the tenant's person and property and breached that duty by his actions. *Id.* at 539. The court concluded that the independent tort doctrine did not bar the tenant's tort claims. *Id.*

The South Dakota Supreme Court also held that the independent tort doctrine did not bar plaintiffs' claim for deceit in *Grynberg v. Citation Oil & Gas Corp.*, 573 N.W.2d 493 (S.D. 1997). In *Grynberg*, the plaintiffs, oil field owners, entered into a contract with defendant, who was tasked with managing the exploration and production of plaintiffs' oil fields. *Grynberg*, 573 N.W.2d at 497-98. As part of the contract, the defendant agreed to provide plaintiffs with monthly accountings of the costs of drilling, completing, and equipping each well. *Id.* at 498. Over a period of two years, the defendant stole plaintiffs' money and engaged in fraudulent accounting practices to hide its theft. *Id.* at 498-99. Upon discovering defendant's deceit, plaintiffs brought claims for breach of contract and fraud. *Id.* at 497. The South Dakota Supreme Court held that the independent tort doctrine did not bar the plaintiffs' fraud claim because the defendant breached a duty separate and apart from the obligations owed under the contract. *Id.* at 501. The court further explained that "a contract is not a license to allow one party to cheat or defraud another." *Id.*

The South Dakota Supreme Court distinguished *Grynberg* in *Schipporeit v. Khan*, 775 N.W.2d 503 (S.D. 2009). There, the contract at issue involved the sale of a hotel from the defendant to the plaintiffs. *Schipporeit*, 775 N.W.2d at 504. Plaintiffs brought claims for breach of contract, conversion, and fraudulent misrepresentation after the defendant diverted reservations and property from the hotel plaintiffs were purchasing to a nearby competing hotel that the defendant owned. *Id.* at 506-07. The South Dakota Supreme Court held that no independent tort duty existed outside of the contract, however, because the sales contract obligated the defendant to deliver the diverted reservations and property to the plaintiff at closing. *Id.* at 507-08. In distinguishing *Grynberg*, the South Dakota Supreme Court noted that

> [n]ot only did the plaintiffs in *Grynberg* not receive the benefits due to them under the contract, they were also defrauded by false representations. The false representations and fraudulent accounting practices caused the owners to agree to continue to have the defendant manage the oil fields and caused the owners to pay excessive costs. Thus, the tortious conduct involved more than the elements, i.e. terms of the contracts, and were based, in part, on the nature of the on-going relationship between the parties.

*Id.* at 506.

Here, the court finds that the independent tort doctrine does not bar NLT's claim for fraudulent misrepresentation. NLT's allegations are not limited to the allegation that WE simply breached the contract by failing to provide services to NLT's customers and provide the access codes to NLT. *See* Docket 40 ¶ 89. Instead, NLT alleges that WE, in an attempt to mislead and damage NLT, represented that it had access codes it could use to provide services to

NLT's customers. *Id.* ¶¶ 95-99. NLT alleges that if WE "did not have any access to the Data Center, then . . . WE fraudulently represented any and all work NLT paid for under the oral agreement." *Id.* ¶ 62. NLT also alleges that because WE refused to provide the access codes to NLT following its "cancellation of the oral agreement," NLT was led to believe that "it could not access electronic communications, general security, and operations of and within its own Data Center." *Id.* ¶¶ 58, 65. Lastly, NLT alleges that WE worked with a former NLT employee "to further perpetuate fraud and injustice upon NLT for the purpose of wasting NLT's resources" and "to disrupt NLT's services to get revenge against NLT." *Id.* ¶¶ 77, 79.

The court finds that these factual allegations are most comparable to the facts in *Grynberg*. The parties had a working relationship prior to the subcontracting agreement. The nature of the parties' ongoing relationship allowed WE to allegedly misrepresent that it already had the appropriate access codes to provide services to NLT's customers. This ongoing relationship also allowed WE to rely upon its alleged factual misrepresentation to harm and take "revenge" against NLT's business. *See* Docket 40 ¶ 79. At the pleading stage, the court finds that NLT has sufficiently alleged that WE owed a legal duty that arose independently from the duties it owed NLT under the subcontracting agreement. *See Grynberg*, 573 N.W.2d at 501 (noting the "legal duty which is due from every man to his fellow, to respect his rights of property . . . and refrain from invading them by . . . fraud") (citation and emphasis omitted). Thus, taking NLT's allegations as true, the court finds that NLT's claim for

fraudulent misrepresentation is not barred by the independent tort doctrine and denies WE's motion to dismiss NLT's claim for fraudulent misrepresentation.

### D.     Conversion

WE argues that NLT's claim for conversion is barred by the independent tort doctrine because the items that NLT alleges WE converted—the phone, laptop, Kia, and access codes—were all provided for under the parties' contracts. *See* Docket 56 at 15; Docket 58 at 6. NLT argues that this court should reject WE's arguments because WE failed to support its arguments with legal authority and because "[c]onversion is generally viewed as an independent tort." Docket 57 at 21-23.

NLT's arguments, however, ignore the South Dakota Supreme Court's ruling in *Schipporeit*. As noted above, in *Schipporeit*, the court expressly ruled that the independent tort doctrine barred the plaintiff's claims for conversion and fraudulent misrepresentation because the plaintiff failed to show that defendant's "breach was extraneous to the contract." *Schipporeit*, 775 N.W.2d at 507. But unlike the decision in *Schipporeit*, the court finds that the independent tort doctrine does not bar NLT's claim for conversion. Here, the parties' relationship included more than a "one-time contract," which included terms that "detailed the duties of the parties." *Id.* Instead, WE already possessed the phone, laptop, Kia, and access codes prior to entering the oral agreement. *See* Docket 40 ¶¶ 29-31, 33. And while the oral agreement provided for WE's continued possession of the items until the completion of the contract,

24

*see id.* ¶¶ 48, 50, the agreement did not contemplate that WE would use these items "to purposefully cause interruptions to NLT's services," *id.* ¶¶ 65-69. This alleged conduct removes the facts of this case from the scope of *Schipporeit* and places them in the realm of cases similar to *Grynberg.*

As such, accepting NLT's allegations as true, the court finds that NLT has sufficiently alleged that WE owed it a duty extraneous to the parties' contract. *See also Rozone Prods., LLC*, 2012 WL 13172982, at *6 ("Every citizen has an independent tort duty not to steal the property of another . . . even if there is no contract between them."). Thus, at this stage, the court denies WE's motion to dismiss NLT's claim for conversion under the independent tort doctrine.

**E.    Recission**

Lastly, the court finds that NLT has plausibly stated a claim for recission. South Dakota law provides that a party may rescind a contract when any of the following are present:

(1) If consent of the party rescinding or of any party jointly contracting with him was given by mistake or obtained through duress, fraud, or undue influence exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party;

(2) If through fault of the party as to whom he rescinds, the consideration for his obligation fails in whole or in part;

(3) If the consideration becomes entirely void from any cause;

(4) If such consideration before it is rendered to him fails in a material respect from any cause; or

(5) By consent of all the other parties.

SDCL § 53-11-2. In its first amended complaint, NLT pleaded that its consent to the oral agreement was obtained through fraud, *see* Docket 40 ¶ 141, and

that consideration fails or is entirely void, *see id.* ¶ 143. WE attacks NLT's allegations of fraud on the basis that NLT has not alleged fraud with particularity. Docket 56 at 18. But as this court determined above, NLT has plausibly stated a claim for fraudulent misrepresentation with particularity. Thus, the court rejects WE's argument that NLT's claim for recission should be dismissed for failure to state a claim.

## CONCLUSION

For the reasons above, it is

ORDERED that Wehde's motion to dismiss all claims in the first amended complaint against him individually (Docket 54) is granted. It is

FURTHER ORDERED that defendant WE's motion to dismiss (Docket 55) is denied.

Dated January 13, 2026.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE